# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| AMGEN INC. and AMGEN MANUFACTURING LIMITED,<br><br>      Plaintiffs,<br><br>    - against -<br><br>APOTEX INC. and APOTEX CORP.,<br><br>      Defendants. | Case No. 15-cv-61631-JIC/BSS |

### REBUTTAL DECLARATION OF RICHARD C. WILLSON, PH.D. REGARDING CLAIM CONSTRUCTION OF SHULTZ ET AL., U.S. PATENT NO. 8,952,138

I, RICHARD C. WILLSON, hereby declare:

1. I am the same Richard C. Willson who submitted a declaration ("Willson Dec."), dated December 11, 2015, in support of Plaintiffs' Opening Claim Construction Brief in the above-captioned case. My qualifications and CV were presented therein and are not repeated here.

2. I have been asked for my opinions on the constructions of disputed terms of claim 1 of U.S. Patent No., 8,952,138 ("the '138 Patent") proposed by Apotex and its expert, Dr. Anne S. Robinson.

3. In preparing this declaration, in addition to the materials referred to in ¶13 of my earlier declaration, I have reviewed the Declaration of Anne S. Robinson, Ph.D. in Support of Defendants' Opening Claim Construction Brief ("Robinson Dec."), dated December 11, 2015; the portions of the parties' opening claim construction briefs that pertain to the '138 Patent; as well as the table in the parties' Joint Claim Construction Statement (D.E. 69) that sets forth the parties' constructions of the disputed terms of claim 1 of the '138 Patent.

4.     In my opinion, a person of ordinary skill in the art ("POSITA")[1] would interpret the disputed terms in accordance with Amgen's proposed constructions, with which I agree. They are more faithful to the language of the claim, the specification and prosecution history and the state of the art as of June 22, 2009, the priority date of the '138 Patent.

5.     My overall impression of Apotex's and Dr. Robinson's proposed constructions is that they wish to rewrite claim 1 of the '138 Patent substantially so that the specified protein concentration, thiol-pair ratio ("TPR") range and redox buffer strength are associated with the <u>refold mixture</u>, rather than with the protein-containing <u>volume</u> and <u>redox component</u> of the <u>refold buffer</u>, prior to the formation of the refold mixture. In addition, Apotex and Dr. Robinson would cap the redox buffer strength at 100 mM when claim 1 does not specify an upper boundary.

6.     To illustrate what I mean, claim 1 of the '138 Patent reads as follows:

> 1.     A method of refolding a protein expressed in a non-mammalian expression system and present in a volume at a concentration of 2.0 g/L or greater comprising:
> (a)     contacting the protein with a refold buffer comprising a
>           redox component comprising
>                 a final thiol-pair ratio having a range of
>                 0.001 to 100 and
>                 a redox buffer strength of 2 mM or greater and
>           one or more of:
>                 (i)     a denaturant;
>                 (ii)    an aggregation suppressor; and
>                 (iii)   a protein stabilizer;
>           to form a refold mixture;
> (b)     incubating the refold mixture; and
> (c)     isolating the protein from the refold mixture.

---

[1] I note that Dr. Robinson's and my definition of the POSITA differ somewhat. Compare 1st Willson Dec. ¶27 with Robinson Dec. ¶47. I disagree that a POSITA is someone with "a Bachelor's degree (or the equivalent) in Biochemistry or Chemical Engineering with several years' experience in biochemical manufacturing, protein purification and protein refolding." I believe the '138 Patent speaks to persons with more advanced degrees than a Bachelor's for reasons I discussed in ¶26 of my prior declaration.

2

7. The constructions that Apotex and Dr. Robinson propose, however, suggest that a POSITA would read claim 1 to say something different, like the following:

> 1. A method of refolding a protein expressed in a non-mammalian expression system comprising:
>    (a) contacting the protein with a refold buffer comprising a redox component and one or more of:
>       (i) a denaturant;
>       (ii) an aggregation suppressor; and
>       (iii) a protein stabilizer;
>    to form a refold mixture, <u>wherein the refold mixture comprises</u>:
>       <u>protein at a concentration of 2.0 g/L or greater;</u>
>       <u>a final thiol-pair ratio having a range of 0.001-100; and</u>
>       <u>a redox buffer strength of 2 mM to 100 mM;</u>
>    (b) incubating the refold mixture; and
>    (c) isolating the protein from the refold mixture.

8. The underlined language in the rewritten claim above emphasizes how Apotex and Dr. Robinson have taken parameters associated with the protein-containing volume and the redox component of claim 1 as it is actually written and effectively redefined them to be associated with the refold mixture.

9. Claim 1 is simply not written as Apotex and Dr. Robinson would have it. Rather, as discussed in my earlier declaration and is plain from its wording, claim 1 of the '138 Patent is structured such that a volume containing 2.0 g/L of protein or greater is contacted with a refold buffer, the redox component of which comprises the specified TPR range (0.001 to 100) and a redox buffer strength of 2 mM or greater, to form the refold mixture. Upon contact, the protein-containing volume necessarily dilutes the ingredients of the refold buffer and, conversely, the refold buffer necessarily dilutes the protein in the protein-containing volume. Consequently, the concentration of the protein and the various other ingredients in the <u>refold</u>

3

mixture cannot be as Apotex and Dr. Robinson suggest, but, necessarily, are more dilute. Thus, Apotex and Dr. Robinson's constructions are belied by the language of claim 1 alone.

10. I will now address the constructions and reasoning expressed by Dr. Robinson in her declaration for each of the disputed claim terms.

***"A protein … present in a volume at a concentration of 2.0 g/L or greater"***

11. I disagree with Dr. Robinson's proposed construction that this phrase means "a protein . . . present at a concentration of 2.0 g/L or greater after dilution in a refold buffer" and agree with Amgen that a POSITA would understand the phrase to mean "a protein as it exists in a volume before contacting the volume with a refold buffer. The protein concentration in the volume is 2.0 g/L or greater."

12. I note, at the outset, that in expressing her opinion that it is in the refold mixture that the protein concentration is 2.0 g/L or greater, Dr. Robinson has ignored the explicit disclosures in the '138 Patent, discussed in ¶¶33-35 of my earlier declaration, that the protein concentration in the refold mixture can be as low as 1 g/L. *See* '138 Patent, col. 10, lines 12-16 ("…allows for refolding at concentrations of 1-40 g/L…") and col. 12, lines 44-49 ("The dilution results in a protein concentration in the range of 1 to 15 g/L…"). For this reason alone, I believe Dr. Robinson's opinion is mistaken.

13. Furthermore, there are disclosures in the '138 Patent, some of which Dr. Robinson relies on,[2] that would convey to a POSITA that 2.0 g/L is not the "floor" protein concentration in the refold mixture, but instead is simply an example of a high protein concentration at which the claimed refolding method can be practiced.

14. Specifically, the '138 Patent at col. 4, lines 15-24 states:

---

[2] *See* Robinson Dec. at ¶¶58-59.

4

> As described herein, by controlling the thiol-pair buffer strength, in conjunction with thiol-pair ratio and protein concentration, the efficiency of protein folding operations can be optimized and enhanced and the refolding of proteins at high concentrations, <u>for example</u> 2 g/L or greater, can be achieved.
> Thus, in one aspect, the present disclosure relates to the identification and control of redox thiol-pair ratio chemistries that facilitate protein refolding at high protein concentrations, <u>such as</u> concentrations higher than 2.0 g/L (emphasis added).

15. Combining the foregoing disclosures of 2 g/L as an <u>exemplary</u> high protein concentration with the disclosures at col. 10, line 16 and col. 12, line 47 that the protein concentration in the refold mixture can be 1 g/L, a POSITA would not accept Dr. Robinson's proposed construction that the protein concentration in the refold mixture can be no lower than 2.0 g/L.

16. At ¶ 56 of her declaration, Dr. Robinson offers the opinion that:

> [O]ne skilled in the relevant art would understand the claim term "a protein . . . present in a volume at a concentration of 2.0 g/L or greater," as disclosed and used in the '138 Patent, to mean "a protein . . . present at a concentration of 2.0 g/L or greater after dilution in a refold buffer," <u>thus forming the refold mixture</u>. (emphasis added)

17. In other words, Dr. Robinson appears to be saying that the terms "volume" and "refold mixture" in claim 1 mean the same thing, that they are synonymous. I disagree with this view because the specification of the '138 Patent uses the term "volume" in numerous places to refer to things that are clearly not a refold mixture.

18. For example, at column 3, lines 19-21, the '138 Patent teaches that "[i]n some embodiments, the protein is initially present in a <u>volume</u> in a non-native limited solubility form, such as an inclusion body." And at column 7, lines 16-19, a "solubilization pool" is defined as "a <u>volume</u> of solution comprising a solubilized protein of interest as well as [other

5

chemicals] selected to solubilize the protein." And at column 9, line 63-column 10, line 6, the patent states:

> In one aspect, the present disclosure relates to a method of refolding a protein expressed in a non-mammalian expression system in a soluble form and present in a <u>volume</u> at a concentration of 2.0 g/L or greater, such as a protein that has been purified by affinity chromatography from the cell lysate of non-mammalian cells in which the protein was expressed. Although the <u>volume</u> can be derived from any stage of a protein purification process, in one example the <u>volume</u> is an affinity chromatography elution pool (e.g., a Protein A elution pool). In another example, the <u>volume</u> is situated in a process stream. (emphasis added)

19. In none of the foregoing instances does the word "volume" mean "refold mixture." In fact, all of these protein-containing volumes are volumes as they exist prior to contacting them with a refold buffer; that is, prior to formation of the refold mixture. The way the specification uses "volume" is consistent with Amgen's proposed construction, not Apotex's.

20. Dr. Robinson also relies on the prosecution history of the '138 Patent as supporting her proposed construction that the 2.0 g/L protein concentration recited in claim 1 of the '138 Patent is in the refold mixture and not the original protein-containing volume.

21. At ¶63 of her declaration, she cites the following passage from a Response to Office Action, dated February 23, 2012 (attached as Exhibit A), at page 6:

> Turning to the '370 patent, applicants submit that nowhere in this document is the concept of refolding at a concentration of 2.0 g/L or greater disclosed … Applicants submit that the combined dilution of approximately 250-fold does not lend itself to the creation of a high protein refolding mixture, as recited in applicant's pending claims.

22. These remarks were made in response to a rejection of the then-pending claims[3] as anticipated by U.S. Patent No. 7,138,370 (attached as Exhibit B) (the "'370 Patent"). I have reviewed Example 5 at column 76 of the '370 Patent (the part of the patent the Examiner

---

[3] Pending claim 1 was no different from claim 1 as issued in the '138 Patent.

6

referred to in rejecting the claims) and it does not provide the protein concentration in the refold mixture disclosed therein.  Thus, the characterization of the prior art '370 Patent as not disclosing the concept of refolding proteins at concentrations of 2.0 g/L or greater was correct.  But this statement is a characterization of the prior art, not the claimed invention.

23.     It is the second sentence, quoted above, that characterizes the invention of the '138 Patent:

> Applicants submit that the combined dilution of approximately 250-fold does not lend itself to the creation of a <u>high concentration refolding mixture, as recited in applicant's pending claims</u>.  (emphasis added)

24.     As is evident, the claimed invention is characterized as "high concentration" protein refolding, which, as I discussed in my earlier declaration at ¶¶ 29-50, is inclusive of 1 g/L in the refold mixture.  In my opinion, the claimed invention was being distinguished from the prior art on the qualitative difference between "high" protein concentration refolding (the claimed invention) and the low protein concentration refolding of the prior art, which was inferable from the 250-fold dilution.  A quantitative comparison based on particular concentrations could not be made because Example 5 of the '370 Patent does not report protein concentration in the refolding mixture.

25.     Furthermore, at page 6 of the February 23, 2012 Response to Office Action, the following statement was made:

> Applicants note that <u>in various embodiments the claimed invention</u> is directed to refolding complex molecules in a pool having a concentration of 2.0 g/L or greater.

And the applicants also quoted the following passage from the specification:

> Prior to the present disclosure a specific controlled investigation of the independent effects of thiol-pair ratio and thiol-pair buffer strength had not been disclosed for complex proteins.  As described herein, by controlling the thiol-pair buffer strength, in

7

> conjunction with thiol-pair ratio and protein concentration, the efficiency of protein folding operations can be optimized and enhanced and the refolding of proteins at high concentrations, <u>for example 2 g/L or greater</u>, can be achieved.

February 23, 2012 Response to Office Action at page 6.

26. As with the statements in the specification at col. 4, lines 14-24 cited above, which explicitly teach that 2.0 g/L or greater is just an example,[4] the POSITA would understand refolding at 2.0 g/L of protein or greater to be an embodiment or example of the invention, but would not understand 2.0 g/L to be the minimum protein concentration in the refold mixture of claim 1.

27. I have also reviewed the Office Action dated January 29, 2014 (attached hereto as Exhibit C) and the Amendment Response dated April 28, 2014 (attached hereto as Exhibit D) in the prosecution history of the '138 Patent. I note in the Office Action that the rejection of the claims over the '370 Patent was maintained by the Examiner.

28. In response to the rejection, Amgen said nothing about a protein concentration of "2 g/L or greater." Instead, Amgen's attorney substantiated that the dilution used in the prior art '370 Patent was 250-fold:

> Applicant believes the Examiner's ground of rejection under § 102(b) and the previous attorney of record's traversal center around an unfortunate confusion with regard to the term "1/10 ratio" as indicated in the '370 patent at column 76, line 37. While the Examiner views this term as indicating a 10-fold concentration, Applicant's attorney argued that it was a 10-fold dilution. The current attorney of record has clarified the meaning of the term and hopefully resolved the impasse. The '370 patent was invented by employees of the current assignee and the current attorney of record was able to clarify the disputed term with a co-inventor of the '370 patent as well as others intimately familiar with the peptibody production method disclosed in Example 5 of the '370 patent. The current attorney of record has determined from these discussions, and is stating

---

[4] "… proteins at high concentrations, <u>for example</u> 2 g/L or greater…"; "… high protein concentrations, <u>such as</u> concentrations higher than 2.0 g/L…" (emphasis added).

8

over his signature and on the record, that the term "1/10 ratio" as used at the relevant section of the patent (as it relates to solubilized inclusion bodies) was meant to convey and still means a 10-fold dilution. Thus, the calculation showing a 250-fold dilution (10-fold dilution from the inclusion body solubilization and 25-fold dilution from the oxidation step) appears to be correct. Applicant believes that confirmation and clarification of the disputed passage from the '370 patent will address the basis of the Examiner's rejection. Accordingly, Applicant courteously requests withdrawal of the rejection.

29. The rejection was then withdrawn in an Office Action dated June 27, 2014. This course of events indicates to me that the reason the patent was granted was because the prior art '370 Patent was distinguished from the claimed invention as refolding protein under unspecified but very dilute conditions. I see nothing that suggests to me that anything the applicants may have said earlier about protein concentrations of "2 g/L or greater" persuaded the Examiner to allow the claims. Thus, in my opinion, the prosecution history of the '138 Patent does not support interpreting claim 1 as requiring 2 g/L or greater protein concentration in the refold mixture, as Apotex proposes.

30. In summary, based on the language of the claim itself, the patent specification and prosecution history and the state of the art, I believe a POSITA would not interpret "a protein . . . present in a volume at a concentration of 2.0 g/L or greater" to mean, as Apotex and Dr. Robinson propose, "a protein . . . present at a concentration of 2.0 g/L or greater after dilution in a refold buffer." Rather, a POSITA would interpret the term to mean, as Amgen proposes, "a protein as it exists in a volume before contacting the volume with a refold buffer. The protein concentration in the volume is 2.0 g/L or greater."

*"Refold buffer" and "redox component"*

31. While Dr. Robinson criticizes Amgen's proposed constructions of these terms as being unnecessarily redundant (Robinson Dec. ¶67), I view Amgen's proposed constructions as being more precise. Thus, I agree with Amgen that a POSITA would

9

understand that the term "refold buffer" in claim 1 is comprised of (1) a redox component and (2) one or more of (i) a denaturant; (ii) an aggregation suppressor; and (iii) a protein stabilizer.

32. Similarly, I agree it is the redox component that is comprised of a final thiol-pair ratio in the range of 0.001-100 and a redox buffer strength of 2 mM or greater. I further agree that the redox component can be comprised of combinations of thiol-reactive chemicals as supported by the specification of the '138 Patent at col. 7, line 2.

*"Final thiol-pair ratio" and "redox buffer strength"*

33. While Amgen and Apotex appear to agree that final thiol-pair ratio ("TPR") and redox buffer strength ("RBS") are defined according to Equations 1 and 2, respectively set forth in column 6 of the '138 Patent, the parties dispute the meaning of the variables used to calculate these terms. In both equations, "[oxidant]" and "[reductant]" are the variables. In scientific parlance, the brackets symbols ("[ ]") signify a concentration, which is understood to mean amount per volume, such as grams per liter or moles per liter. Amgen proposes the values of the variables used to calculate TPR and RBS are the concentrations of the oxidant and reductant <u>in the redox component</u>, whereas Apotex proposes that they are the concentrations of the oxidant and reductant contributed by redox component and the thiol-reactive substituents of the protein <u>in the refold mixture</u>. I agree with Amgen.

34. First, the language of claim 1 of the '138 Patent clearly and explicitly specifies that it is the redox component, not the refold mixture, that comprises the TPR and RBS. Claim 1 recites "a redox component comprising a final [TPR] having a range of 0.001 to 100 and a [RBS] of 2 mM or greater". This clearly specifies that the values to be used in calculating Equation 1 (TPR) and Equation 2 (RBS) should be based on the redox component, not the refold mixture.

10

35. Similarly, the patent specification associates TPR and RBS with the redox component, not with the refold mixture. At col. 10, lines 22-30 the '138 Patent states:

> The protein is then contacted with a refold buffer comprising a denaturant, an aggregation suppressor, a protein stabilizer and a <u>redox component, wherein the redox component has a final thiol-pair ratio</u> (as defined herein) having a range of 0.001 to 100 . . . and a <u>Thiol-pair [i.e. redox] buffer strength</u> (as defined herein) equal to or greater than 2 mM[.]

And similarly, at col. 11, lines 40-46, the '138 Patent states:

> A <u>redox component</u> of the refold buffer can be of any composition, with the caveat that the <u>redox component</u> has a <u>final thiol-pair ratio</u> in a range of 0.001 – 100 . . . and a <u>Thiol-pair buffer strength</u> of greater than or equal to 2 mM[.]

36. Therefore, the patent specification also supports my opinion that the concentrations used to calculate Equation 1 (TPR) and Equation 2 (RBS) should be those of the oxidant and reductant in the redox component.

37. Dr. Robinson makes much ado in her declaration about the word "final" as supporting her position that TPR and RBS be calculated using concentrations based on the volume of the refold mixture. For instance, in ¶ 74 she states:

> It is also my opinion that the "<u>final</u> thiol-pair ratio" must also mean the ratio in the redox [sic, refold] mixture, the volume in which all components necessary for refolding have been added. In fact, to calculate the ratio in any other volume (i.e., the redox component as suggested by Plaintiffs) would not result in a "final" thiol-pair ratio. (emphasis in original).

38. Dr. Robinson makes a similar argument in ¶ 81 for redox buffer strength, even though the word "final" is not used to modify this term either in the claim or in the specification.

39. Dr. Robinson's reliance on the word "final" is clearly misplaced. It does not even apply to "redox buffer strength." And, in view of the language cited in ¶ 35, above

11

("wherein the redox component has a final thiol-pair ratio" and "redox component has a final thiol-pair ratio"), the final thiol pair ratio, the term used in claim 1, is associated with the redox component, not the refold mixture.  Therefore, the calculation of final thiol-pair ratio (and redox buffer strength) is more consistent with the claim and specification if based on concentrations of oxidant and reductant in the redox component.

40.  At ¶ 75 and ¶ 82 of her declaration, Dr. Robinson argues, "the inventors clearly intended that the 'total reaction,'[5] protein and all, be included when calculating [the final thiol-pair ratio and the redox buffer strength]."  I completely disagree.  Nowhere in the '138 Patent do the inventors calculate the contribution of the protein in the refold mixture to TPR or RBS.  Nor do they describe how to do it or address the challenges of doing so, given the presence of other thiol-reactive chemicals (such as, e.g., DTT carried over from a solubilization step, and mixed contaminating proteins) in the refold mixture, which Dr. Robinson seemingly ignores.

41.  To be sure, the inventors of the '138 Patent acknowledge that the "balance" between final thiol-pair ratio and redox buffer strength can be impacted by thiol-reactive chemicals in the refold mixture.  I take this to be a warning that an empirical approach is necessary to find the right "balance" for a given protein and the other thiol-reactive chemicals in the refold mixture.  At col. 8, lines 19-43 the patent states:

> The optimal refold chemistry for a given protein represents a careful balance that maximizes the folded/oxidized state while minimizing undesirable product species . . . .  One factor that is important in achieving this balance is the redox-state of the refold system.  The <u>redox-state is affected by many factors</u>, including, but not limited to, the <u>number of cysteine residues contained in the protein,</u> <u>the ratio and concentration of the redox couple chemicals in the refold solution</u> (e.g., cysteine, cystine, cystamine, cysteamine,

---

[5]  I take "total reaction" to mean the refold mixture.

12

> glutathione-reduced and glutathione-oxidized), <u>the concentration of reductant carried over from the solubilization buffer</u> (e.g., DTT, glutathione and beta-mercaptoethanol), <u>the level of heavy metals in the mixture</u>, and <u>the concentration of oxygen in the solution</u>.
>
> <u>Thiol-pair ratio and thiol-pair buffer strength</u> are defined in Equations 1 and 2, infra [sic, supra], using cysteine and cystamine as an example reductant and oxidant, respectively.  <u>These quantities, coupled with protein concentration and reductant carry-over from the solubilization, can be factors in achieving a balance between the thiol-pair ratio and the thiol-pair buffer strength</u>.

(emphasis added)

42.     But the acknowledgement of factors that impact this "balance" is not an instruction to calculate TPR and RBS based on concentrations of thiol-reactive chemicals in the (potentially very complex) refold mixture.  Rather, as the second paragraph cited above states, TPR and RBS are separate "quantities" from the protein and carry-over reductants in the refold mixture.  Consequently, it follows that TPR and RBS should be separately calculated based on the concentrations of oxidant and reductant in the redox component and <u>not</u> be calculated based on all the thiol-reactive chemicals in the refold mixture.  From a practical point of view, calculations based on the relatively simple, controllable composition of the redox component are vastly easier than those based on the composition of the refold mixture, which normally is both complex and incompletely characterized.  The '138 Patent gives no examples of calculations based on the refold mixture composition.  Thus, in my opinion, a POSITA would understand that TPR and RBS are based on concentrations of oxidant and reductant in the redox component and not, as Dr. Robinson suggests, in the refold mixture.

43.     Throughout the '138 Patent, the inventors teach that the refolding of any given protein is influenced by thiol-pair ratio and thiol-buffer strength and that by identifying and controlling these parameters, optimal conditions for refolding the protein can be empirically determined.  In fact, the patent plainly teaches that, because the refold mixture contains protein,

13

carry-over chemicals, etc. (*see* col. 8, lines 28-36), precise pre-selection of optimal TPR and RBS (i.e., identifying in advance of forming a refold mixture a TPR and RBS that will remain in balance, despite the other thiol-reactive chemicals in the ultimate refold mixture) is not feasible and therefore an experimental approach is needed.  For instance the '138 Patent states:

> Prior to the present disclosure a <u>specific controlled investigation</u> of the independent effects of thiol-pair ratio and thiol-pair buffer strength had not been disclosed for complex proteins.
>
> * * * *
>
> Thus, in one aspect, the present disclosure relates to the <u>identification and control</u> of redox thiol-pair ratio chemistries that facilitate protein refolding at high protein concentrations, such as concentrations higher than 2.0 g/L. The method can be applied to any type of protein, including simple proteins and complex proteins . . . .
>
> * * * *
>
> <u>A mathematical formula was deduced to allow the precise calculation of the ratios and strengths of individual redox couple components to achieve matrices of buffer thiol-pair ratio and buffer thiol strength</u>.  Once this relationship was established, it was possible to systematically demonstrate that thiol buffer strength and the thiol-pair ratio interact to define the distribution of resulting product-related species in a refolding reaction.
>
> * * * *
>
> <u>Optimization</u> of the buffer thiol strength and the system thiol pair ratio <u>can be tailored to a particular protein</u>, such as a complex protein, to minimize cysteine mispairing yet still facilitate a refold at a high concentration.
>
> * * * *
>
> <u>Optimization</u> of the redox component[:] Thiol-pair Ratios and Thiol-pair Buffer Strengths can be performed for each protein.  <u>A matrix or series of multifactorial matrices can be evaluated</u> to optimize the refolding reaction for conditions that optimize yield and distributions of desired species.

'138 Patent, 4:20–58, 9:20–24.

   44. The '138 Patent repeatedly emphasizes that protein refolding at high concentrations can be optimized by identifying and controlling a suitable TPR and RBS.  It makes sense that the concentrations of oxidants and reductants used to calculate TPR and RBS should be based on the redox component, because the researcher would have both precise

14

knowledge of and control over these concentrations (and would have neither precise knowledge of , nor control over, the composition of the refold mixture). In practice, a researcher would prepare the redox component as a solution of oxidants and reductants at chosen concentrations. The researcher has precise control over the amount of oxidants and reductants being added to the solvent used in preparing the redox component. As the '138 Patent discloses, in this manner, guided by the teachings of the patent, the concentrations in the redox component can be empirically varied until optimal conditions are identified.

45. In my opinion, a POSITA reading claim 1 of the '138 Patent in view of the specification would understand TPR and RBS to be based on the controllable oxidant and reductant concentrations of the redox component, rather than on the total oxidant and reductant concentrations that exist in the refold mixture, where the cysteine residues of the protein, carry-over chemicals from prior process steps, contaminating proteins, and other substances contribute to the overall oxidant and reductant concentrations. To determine or measure the concentrations of all such thiol-reactive chemicals in the refold mixture would be very difficult to do, and the '138 Patent nowhere suggests doing so. Therefore, in my opinion, the patent is better understood as teaching how best to optimize refold conditions by tailoring what can be controlled, the concentrations of oxidants and reductants in the redox component, to the given protein. For this reason, it makes more sense to calculate TPR and RBS based on the redox component, not the more complex redox chemistry of the refold mixture.

46. Lastly, Equations 1 and 2 in column 6 of the patent themselves suggest that such things as the thiol-reactive substituents of the protein, protein contaminants, and carry-over thiol-reactive chemicals in the refold mixture are <u>not</u> taken into account when calculating TPR and RBS, only the components of the redox component are to be taken into account.

15

47. For each parameter, a "side equation" is presented illustrating the calculation to be performed, as based on exemplary thiol-reactive chemicals, specifically cysteine and cystamine. Thus, Equation 1 is

$$\text{Buffer TPR} = \frac{[\text{reductant}]^2}{[\text{oxidant}]} = \frac{[\text{cysteine}]^2}{[\text{cystamine}]}$$

and Equation 2 is

$$\text{Thiol-pair Buffer Strength} = 2[\text{oxidant}] + [\text{reductant}] = 2[\text{cystamine}] + [\text{cysteine}]$$

48. Notably, neither "side equation," or illustrative calculation, involves the thiol-reactive constituents of the protein in the refold mixture, or other thiol-reactive contaminants and carry-over chemicals present in the refold mixture, but not present in the redox component. This absence, in my opinion, further supports Amgen's proposed construction that TPR and RBS are based on concentrations of oxidants and reductants in the redox component, not those in the refold mixture.

49. Consequently, I believe that a POSITA would interpret "final thiol-pair ratio" and "redox buffer strength" in claim 1 of the '138 Patent as Amgen proposes (for "final thiol-pair ratio": "Defined by the following equation: $[\text{reductant}]^2/[\text{oxidant}]$, where the concentrations are the concentrations in the redox component," and for "redox buffer strength": "Also called 'buffer thiol strength,' 'thiol-pair buffer strength,' or 'thiol-pair strength,' defined by the following equation: $2[\text{oxidant}]+[\text{reductant}]$, where the concentrations are the concentrations in the redox component."). I do not believe a POSITA would interpret these terms as Apotex and Dr. Robinson propose (for "final thiol-pair ratio": "The relationship of the reduced and oxidized redox species used in the refold buffer as defined in Equation 1: $[\text{reductant}]^2/[\text{oxidant}]$, where the ratio is the ratio in the refold mixture" and for "redox buffer

strength": "2[oxidant]+[reductant], where the concentrations are the concentrations in the refold mixture").

*"Refold mixture"*

50. I addressed this term in my prior declaration and agree with Amgen's proposed construction that a POSITA would understand this term to mean "a mixture formed from contacting (1) the volume in which the concentration of protein is 2.0 g/L or greater with (2) the refold buffer. The refold mixture has a high protein concentration, where high protein concentration is at or above about 1 g/L protein."

*"2 mM or greater"*

51. Claim 1 of the '138 Patent specifies that the redox buffer strength of the redox component of the refold buffer is 2 mM or greater. I do not agree with Dr. Robinson that this term would be interpreted by a POSITA to mean "2 mM or greater, wherein the redox buffer strength is effectively bounded at a maximum of 100 mM."[6] Although the specification uses the phrase "wherein the thiol-pair buffer strength is effectively bounded at a maximum of 100 mM" in several places (*see* Robinson Dec. footnote 68), the claim language does not provide a range for redox buffer strength capped at 100 mM, but rather, only a floor, 2 mM. Given the abundant teaching throughout the specification of empirically choosing redox buffer strength so that it is optimally balanced with thiol-pair ratio,[7] I do not believe a POSITA would read an upper limit on redox buffer strength into claim 1 as Dr. Robinson has. The optimal redox buffer strength would be initially unknown and might exceed 100 mM when experimentally tested. Thus, I see

---

[6] Though she does not say so, I assume, based on her interpretation of redox buffer strength, that Dr. Robinson means that 100 mM would be the cap on redox buffer strength based on the concentrations of oxidants and reductants in the refold mixture.

[7] *See*, *e.g.*, '138 Patent, col. 4, lines 55-58 ("Optimization of the buffer thiol strength and the system thiol pair ratio can be tailored to a particular protein … to minimize cysteine mispairing yet still facilitate a refold at a high concentration.")

17

no reason to read a 100 mM upper limit on redox buffer strength into the claim as Apotex and Dr. Robinson suggest.

      52.    I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on January 8, 2016 in Houston, Texas.

Dated: January 8, 2016

_____
RICHARD C. WILLSON, PH.D.