# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

---

AMGEN INC. and AMGEN MANUFACTURING
LIMITED,

      Plaintiffs,

    - against -

APOTEX INC. and APOTEX CORP.,

      Defendants.

Case No. 15-cv-61631-JIC/BSS

---

**REBUTTAL DECLARATION OF LOUIS M. PELUS, PH.D.
REGARDING CLAIM CONSTRUCTION OF BAUMANN ET AL.,
U.S. PATENT NO. 6,162,427**

   I, LOUIS M. PELUS hereby declare:

   1.  Amgen Inc. and Amgen Manufacturing Limited (collectively, "Amgen") have retained me as an independent expert consultant in connection with *Amgen Inc. et al. v. Apotex Inc. et al.*, Case No. 15-cv-61631-JIC/BSS.

   2.  For my consultation services, I am receiving $1000 per hour, my standard hourly rate. My compensation is in no way dependent on the content of my opinions or the outcome of this case.

   3.  I am submitting this declaration in support of Amgen's responsive claim construction brief. More specifically, I have been asked for my views on how a person of ordinary skill in the art would understand the terms "chemotherapeutic agent" and "disease treating-effective amount" in claim 1 of Baumann et al., U.S. Patent No. 6,162,427 ("the '427 Patent"), in rebuttal to the opinions expressed by Apotex's expert, Dr. David T. Scadden, about these terms in the declaration he submitted to the Court in support of Apotex's opening claim construction brief.

## I.    Educational and Professional Background

4.    A copy of my curriculum vitae ("CV") including a list of my publications and an addendum detailing my pharmaceutical industry experience is attached hereto as Exhibit A.

5.    In 1973, I received a B.A. degree from Queens College, CUNY, in Biology.

6.    In 1977, I received M.S. and Ph.D. degrees from Rutgers University in Zoology and Immunology, respectively.

7.    I was a NIH Postdoctoral Fellow in Cell Biology in the Department of Calcium Metabolism at the Sloan Kettering Institute ("Sloan Kettering") in New York from 1977 – 1978.  From 1978 – 1980, also at Sloan Kettering, I was a NIH Postdoctoral Fellow in Experimental Hematology and an Associate Researcher in the Department of Developmental Hematopoiesis.  I continued as a Research Associate in this department until September 1982.

8.    I remained at Sloan Kettering through October 1989.  From September 1982 to June 1986, I was an Assistant Member of the Sloan Kettering Institute in the Department of Developmental Hematopoiesis, and from June 1986 to October 1989, I was an Assistant Member and Head of the Department of Hematopoietic Regulation.  During this time period, from September 1982 to October 1989, I was also an Assistant Professor, Sloan Kettering Division – Graduate School of Medical Sciences, Cornell University, New York.

9.    I then spent about a decade, from 1989 to 1999, in the pharmaceutical industry at SmithKline Beecham Pharmaceuticals in Pennsylvania, where I worked in the company's Department of Immunology as a Senior Scientist, in the Department of Anti-Infectives as a Senior Scientist and later, as an Assistant Director, and in the Department of Molecular Virology and Host Defense as an Assistant Director and later, as an Associate

Director.  I was engaged in preclinical and clinical research, drug development, and management thereof, in a variety of fields, including oncology and hematopoietic stem cell mobilization.  In my positions as Assistant and Associate Director I led large teams of workers (sometimes as many as fifty to sixty scientists and other personnel) as we brought drugs from their inception in the research laboratories through drug development and on into the clinic for testing in humans. Among the drugs I had responsibility for developing were agents for stem cell mobilization, and stem cell growth factors.

10.     From 1999 – 2010 I was the Associate Scientific Director of the Walther Oncology Center ("WOC") of Indiana University School of Medicine in Indianapolis, Indiana. In 2010, the WOC was incorporated into the NCI-designated Indiana University Simon Cancer Center ("IUSCC").

11.     I am also a Full Professor (with tenure) in the Department of Microbiology and Immunology at Indiana University School of Medicine, a position I have held since 2004.

12.     I am a full member of the Hematopoiesis, Heme Malignancy and Immunology Program of the NCI-designated IUSCC.  I am also a full member of the Center for Excellence in Molecular Hematology, an NIH-funded Center of Excellence in Experimental Hematology within IUSCC.

13.     I currently oversee a laboratory of four postdoctoral fellows and an Assistant Research Professor.  I also serve on the thesis committees and oversee the research of five graduate students.  I have teaching responsibilities as well, as indicated on my CV, including teaching courses on stem cell biology and stem cell mobilization.

14.     For almost forty years, my research interest has been hematopoiesis, specifically the mechanisms that control blood stem and progenitor cell proliferation/self-

renewal, differentiation and trafficking, and how these pathways can be leveraged to define new therapies for leukemia, other cancers and inherited genetic disorders.

15.     I consider my area of expertise to be stem cell biology, particularly stem cell mobilization. Since the early 1990s, I have been engaged in research to identify and understand the mechanisms of agents that affect the process by which hematopoietic stem cells are mobilized and migrate from bone marrow to the peripheral circulation. In particular, the focus of my research has been to find agents that enhance hematopoietic stem cell mobilization, so that more stem cells may be collected safely and efficiently for use in diseases requiring or benefitting from peripheral stem cell transplantation. In addition to bringing one agent to clinical trial in man at SmithKline Beecham, I am currently directing a trial funded by the NCI using an agent I discovered that enhances stem cell mobilization.

## II.   Status of Case and Legal Principles

### A.   Status

16.     I understand that Amgen has asserted the '427 Patent against Apotex and that the case is now at a phase in which the Court will interpret disputed terms in the patent's claims. I further understand that the parties have recently submitted opening briefs on claim interpretation to the Court and that Apotex's brief was accompanied by Dr. Scadden's declaration.

### B.   Claim Construction

17.     I have been informed that the claims of a United States patent are construed as a matter of law by the Court, but from the perspective of a person of ordinary skill in the art ("POSITA") to which the patent pertains, as of the priority date of the patent. I understand that the '427 Patent claims priority to a patent application first filed in Germany on

December 20, 1995, and, consequently, that the opinions I express herein must be geared to the knowledge and perceptions of a POSITA as of this date.

18.    I have also been informed that patent claims may be interpreted in view of so-called "intrinsic evidence" and "extrinsic evidence."

19.    I understand that intrinsic evidence is comprised of the claim language itself, the patent specification and figures (if any) and the prosecution history, and that literature cited in the specification or during prosecution is considered part of the intrinsic record.

20.    I further understand that extrinsic evidence is comprised of things like learned treatises, text books, technical dictionaries, other literature, and the testimony of experts in the field to which the patent pertains.

21.    I have been informed that in the hierarchy of claim interpretation tools, the patent specification is considered the primary interpretive tool for understanding the meaning of claim terms.

**C.    <u>Indefiniteness</u>**

22.    I have been informed that under a section of the Patent Statute, 35 U.S.C. §112 ¶2, the claims of a patent must "particularly point [ ] out and distinctly claim [ ] the subject matter which the applicant regards as [the] invention," and that the U.S. Supreme Court has recently interpreted Section 112 to require that patent claims, read in light of the specification and prosecution history, inform persons skilled in the art about the scope of the invention with reasonable certainty.

23.    I further understand that if a patent claim does not meet this standard, it is invalid for indefiniteness.

III.   **The Technology of the '427 Patent**

      24.   The '427 Patent pertains to hematopoietic stem cell mobilization, and agents that enhance mobilization of such cells from bone marrow to circulating blood, where they may be collected, for the purpose of treating diseases that require or benefit from peripheral stem cell transplantation.

      25.   Hematopoietic stem cells are the cells in our bodies capable of proliferating and differentiating into cells that make up our blood and our immune systems. After birth, hematopoietic stem cells self-renew, proliferate, differentiate and reside primarily in the bone marrow.

      26.   In treatments of certain diseases requiring peripheral stem cell transplantation, including treatment of certain cancers of the blood or bone marrow, a patient undergoes myeloablative radiation or myelotoxic chemotherapy, as part of a preparative regimen to reduce or obliterate cells in the bone marrow (also called "cytoreductive conditioning"), in effect, clearing out the bone marrow to make it ready to receive a stem cell transplant.  Stem cells collected prior to the preparative regimen are then reinfused or "transplanted" back into the patient after the preparative regimen to replenish the bone marrow and reconstitute the hematopoietic system.

      27.   The step of a transplant protocol that I just referred to as "cytoreductive conditioning" in the preceding paragraph is referred to by Baumann et al. as "antitumor therapy" at col. 3, line 25 of the '427 Patent.  Technically, the radiation and cytotoxic chemotherapeutic agents used at this step (which are administered in high dosages) can destroy residual cancer cells in the patient, and, in that sense, may accurately be called "antitumor therapy."  I note that the '427 Patent also refers to this step as "myeloablative or myelotoxic therapy" at col. 1, lines 57-58.  Thus, as would be understood by a person skilled in the art, the step of a transplant

protocol that readies the bone marrow to receive the transplant by depleting the bone marrow of its existing cellular content (cytoreduction) may also have an anti-tumor or anti-cancer therapeutic effect.

28.     Although hematopoietic stem cells reside primarily in bone marrow after birth, they also can be found in circulating (or "peripheral") blood where they may be collected by a process called leukapheresis.  Once collected, the cells may be stored while a patient undergoes cytoreductive conditioning prior to the transplant, as just discussed.  Thereafter, the stored stem cells are reinfused into the patient and make their way, or home, back to the bone marrow where they can once again provide for normal hematopoietic function.

29.     Certain substances act to "mobilize" stem cells from bone marrow into peripheral blood, thereby increasing the concentration of stem cells in the blood and improving the efficiency of leukapheresis.  As leukapheresis is stressful to patients, the fewer procedures they have to undergo, the better.

30.     At the time of the invention of the '427 Patent, it was known that substances like granulocyte colony stimulating factor ("G-CSF") had the effect of mobilizing stem cells from bone marrow to peripheral blood.

31.     It was also known that agents given for chemotherapy had the effect of mobilizing stem cells from bone marrow to peripheral blood.

32.     In the prior art to the '427 Patent, G-CSF alone, chemotherapeutic agents alone or a combination of a chemotherapeutic agent and a G-CSF, in that order, had been given to patients for stem cell mobilization prior to leukapheresis in the course of treating a disease such as a blood cancer, requiring peripheral stem cell transplantation.

33.     The inventors of the '427 Patent tried something that I believe would have been considered counter-intuitive at the time.  They administered G-CSF first, followed by administration of a chemotherapeutic agent and discovered that, with both agents in this specific order, stem cell mobilization had been enhanced compared to the prior art approaches.[1]  They recognized the usefulness of their approach, giving G-CSF first and then a chemotherapeutic agent, to mobilize more stem cells, prior to leukapheresis as part of the overall protocol for treating diseases benefiting from peripheral stem cell transplantation after cytoreductive conditioning using myeloablative radiation or myelotoxic chemotherapy.

## IV.   The Person of Ordinary Skill in the Art

34.     From the foregoing discussion, one can see that the subject matter of the '427 Patent draws on knowledge of stem cell biology; hematopoiesis; distribution and trafficking of stem cells within the body; agents, both biologic and chemical, that influence such distribution and trafficking; the treatment of diseases requiring stem cell transplantation; as well as expertise in animal models used to study hematopoiesis and agents that affect it.

35.     In my opinion, a person of ordinary skill in the art ("POSITA") to which the '427 Patent pertains would have had a Ph.D. degree in a biological science with expertise in the area of hematopoietic stem cell biology and mobilization or an M.D. degree with several years' experience in treating diseases benefitting from peripheral stem cell transplantation.  In addition, whichever the academic degree, a POSITA would, in my opinion, have expertise in animal models of hematopoiesis and transplantation.

---

[1]     Because G-CSF brings about proliferation of hematopoietic progenitor cells that give rise to granulocytes and monocytes, types of white blood cells, it was counter-intuitive to then administer a chemotherapeutic agent as such an agent might have been expected to damage the newly proliferated white blood cells precursors.

36.     I believe I have the appropriate education and professional experience to judge how a POSITA in December of 1995 would interpret the claims of the '427 Patent.  The priority date of the '427 Patent coincides with my time in the pharmaceutical industry, performing research on stem cell biology and trafficking and developing stem cell mobilization agents.

## V.     Issues Addressed

37.     In rebuttal to the opinions expressed by Apotex's expert Dr. Scadden, I have been asked for my views on what a POSITA, as of December 20, 1995, would understand the terms "chemotherapeutic agent" and "disease-treating effective amount" in claim 1 of the '427 Patent to mean.  Claim 1 of the '427 Patent reads as follows:

> 1.  A method of treating a disease requiring peripheral stem cell transplantation in a patient in need of such treatment, comprising administering to the patient a hematopoietic stem cell mobilizing-effective amount of G-CSF; and thereafter administering to the patient a <u>disease treating-effective amount</u> of at least one <u>chemotherapeutic agent</u>.  (emphasis added)

38.     This declaration summarizes my views on the meaning of these two claim terms.  In preparing this declaration, I have reviewed the '427 Patent, its prosecution history before the United States Patent and Trademark Office, and certain prior art references discussed herein.  I have also reviewed the parties' opening claim construction briefs and the Declaration of David T. Scadden, M.D., in Support of Defendants' Opening Claim Construction Brief.

39.     If asked to testify at any hearing on claim interpretation, I reserve the right to provide additional background on the science and technology underlying the '427 Patent and the right to illustrate my testimony with visual aids.

40.     I reserve the right to modify or supplement my opinions as appropriate, e.g., in response to new opinions expressed by Dr. Scadden or other Apotex witnesses.

## VI.   <u>Interpretation of the Disputed Claim Terms</u>

### A.   *"chemotherapeutic agent"*

41.     I agree with Amgen that a POSITA in December 1995 would understand the term "chemotherapeutic agent" in claim 1 of the '427 Patent to mean an "exogenous substance capable of damaging or destroying microorganisms, parasites or tumor cells."

42.     This construction is consistent with the teachings of the '427 Patent at column 2, lines 37-39 ("Hereinbelow, chemotherapeutic agents are understood to be exogenous substances suited and used to damage or destroy microorganisms, parasites or tumor cells.") And it is also consistent with the general understanding in the art at the time that agents that would function to damage or destroy living organisms and cells had potential as chemotherapeutic agents, *i.e.*, agents that could inhibit the growth of, or kill, cancer cells.

43.     The POSITA reading the '427 Patent would understand that the inventors were also teaching that agents used for chemotherapy because they functioned to damage and destroy cells, could also be used to enhance stem cell mobilization when administered after G-CSF:

> Surprisingly, it has now been found that an unexpectedly high stem cell concentration in blood can be achieved when administering G-CSF in combination with a chemotherapeutic agent (chemotherapeutic agents).
>
> * * * *
>
> According to the invention, it is preferred to apply the G-CSF prior to the onset of the administration of chemotherapeutic agents in order to enhance the mobilization of hematopoietic stem cells.

'427 Patent, 1:62–65, 2:8–10.

44.     The '427 Patent, at column 2, lines 39-54, discloses a wide array of categories of chemotherapeutic agents, and specific, individual chemotherapeutic agents, that may be used for stem cell mobilization in accordance with the invention, as follows:

Here, in particular, cytostatic agents or derivatives thereof from the following group of cytostatic agents may be mentioned: alkylating agents such as, e.g., cyclophosphamide, chlorambucil, melphalan, busulfan, N-mustard compounds, mustargen; metal complex cytostatic agents such as metal complexes of platinum, palladium or ruthenium; antimetabolites such as methotrexate, 5-fluorouracil, cytorabin; natural substances such as vinblastine, vincristine, vindesine, etc.; antibiotic agents such as dactinomycin, daunorubicin, doxorubicin, bleomycin, mitomycin, etc.; hormones and hormone antagonists such as diethylstilbestrol, testolactone, tamoxifen, aminoglutethimide, and other compounds such as, e.g., hydroxyurea or procarbacin, as well as corticoids such as prednisolone, with cyclophosphamide being particularly preferred.

45.     A POSITA would understand these categories and specific compounds to be quite diverse and distinct and would not expect them all to mobilize stem cells by the same mechanism of action. Thus, in my view, a POSITA would understand that the "chemotherapeutic agents" to be used for enhanced stem cell mobilization when practicing claim 1 of the '427 Patent are exogenous substances that damage or destroy microorganisms, parasites, or tumor cells, regardless of the mechanism by which they enhance stem cell mobilization.

46.     I find Apotex's and Dr. Scadden's proposed construction of "chemotherapeutic agent" confusing in its suggestion that the term encompasses both alternative and overlapping meanings, one based on damaging or destroying cells and the other based on a mechanism of action for stem cell mobilization (opening the endothelial barrier, rendering it permeable to stem cells. It is not how a POSITA would understand this term, in view of the patent specification or the then-existing state of the art.

47.     Apotex and Dr. Scadden propose the following construction for "chemotherapeutic agent": "therapeutic agents which open the endothelial barrier, rendering it permeable for stem cells and/or exogenous substances suited and used to damage or destroy microorganisms, parasites or tumor cells" (emphasis added).

11

48.     This construction may be illustrated as follows:



where the circles represent alternative genuses ("or") and the intersecting area represents compounds that perform the function of damaging or destroy cells, and are capable of mobilizing stem cells by acting according to a specific mechanism ("and").

49.     I do not believe a POSITA would interpret "chemotherapeutic agent" in claim 1 of the '427 Patent in this way.  For one thing, I see no disclosure in the '427 Patent of agents which open the endothelial barrier, rendering it permeable for stem cells separate and apart from agents which serve to damage and destroy cells.  The only agent described to "facilitate [ ] the permeability of the endothelial barrier for stem cells" is cyclophosphamide (col. 1, lines 52-53), which is among the "particular" agents described as damaging or destroying cells (col. 2, lines 37-54).  Thus, agents which mobilize stem cells by opening the endothelial barrier are a <u>subset</u> of exogenous substances that damage or destroy cells ("As chemotherapeutic agents in the meaning of the invention[,] those agents <u>may be</u> used which open the endothelial barrier, rendering it permeable for stem cells."  Col. 2, lines 34-36, emphasis added).

50.     In other words, I believe a POSITA would interpret "chemotherapeutic agent" in claim 1 as a genus of exogenous substances that function to damage or destroy microorganisms, parasites or tumor cells, which genus includes, but is not limited to, substances that mobilize stem cells by opening the endothelial barrier, rendering it permeable to stem cells. This may be illustrated as follows:



51.     I have been informed that dependent claims may be considered in the interpretation of the claims from which they depend.

52.     Claim 4 of the '427 Patent reads as follows:

> 4.  The method of claim 1, wherein at least one chemotherapeutic agent opens the endothelial barrier of the patient to render the endothelial barrier permeable for stem cells.

53.     In my view, a POSITA reading claim 4 of the '427 Patent would understand that claim 4 is limited to chemotherapeutic agents which mobilize stem cells by "open[ing] the endothelial barrier of the patient to render the endothelial barrier permeable for stem cells," and would thus understand that the term "chemotherapeutic agent" in claim 1 would

not be limited to chemotherapeutic agents which mobilize stem cells by that particular mechanism of action.

54.    Moreover, based on the state of the art at the time of the invention, a POSITA would not interpret "chemotherapeutic agent" in claim 1 to be limited to only those agents that worked by opening the endothelial barrier, rendering it permeable to stem cells. This is because "opening the endothelial barrier" and affecting its "permeability" to stem cells, though a plausible mechanism for enhancing stem cell mobilization across the endothelial barrier, was merely a proposed mechanism, not a proven one. For this reason, I do not believe a POSITA would have believed the inventors of the '427 Patent to be limiting claim 1 to only those chemotherapeutic agents that worked by this mechanism action.

55.    Several papers speculating on how chemotherapeutic agents enhanced stem cell mobilization into and out of bone marrow were cited in the '427 Patent itself or during its prosecution. For example, Richman et al., "Increase in Circulating Stem Cells Following Chemotherapy in Man," Blood <u>47</u>(6): 1031-1039 (1976), (attached as Exhibit B), cited at col. 1, lines 35-37, states at 1037:

> The mechanism for the appearance of increased numbers of circulating stem cells is unclear… Injury to the supporting structure of the marrow by cytotoxic drugs <u>may</u> also contribute to the release of stem cells into circulation.

(emphasis added)

56.    Closer to the priority date of the '427 Patent, scientists were still speculating about whether the harm caused by agents such as cyclophosphamide to the endothelial barrier was responsible for movement of stem cells into and out of bone marrow.

57.    For instance, in Shirota et al., "Cyclophosphamide-Induced Alterations of Bone Marrow Endothelium:  Implications in Homing of Marrow Cells After Transplantation,"

Exp. Hematol 19:369-373 (1991) (attached as Exhibit C), cited in the '427 Patent at col. 1, lines

50-54, a paper on the movement of transplanted stem cells from peripheral blood to bone marrow

after cytoreductive conditioning with cyclophosphamide, the authors conclude at page 373:

> In summary, a cytotoxic conditioning regimen can induce
> membrane instability leading to massive loss of the endothelial
> membrane.  This can be of such magnitude as to reduce the surface
> area of the endothelium and lead to the loss of integrity of the
> endothelial barrier.  This may set the stage for massive
> transendothelial transport of cells that are infused into circulation
> by bone marrow transplantation.

(emphasis added)

58.     Thus, while Shirota et al. microscopically observed changes to the

endothelial barriers of patients treated with cyclophosphamide, they did not definitively conclude

that these alterations affected permeability or fully explained the transit across the endothelial

barrier of stem cells from peripheral blood to bone marrow.

59.     Similarly, in Neben et al., "Mobilization of hematopoietic stem and

progenitor cell subpopulations from the marrow to the blood of mice following

cyclophosphamide and/or granulocyte colony-stimulating factor," Blood 81(7): 1960-1967

(1993) (attached as Exhibit D), cited during the prosecution of the '427 Patent, the authors did

not definitively conclude that alterations to the endothelial barrier brought about by

cyclophosphamide facilitate mobilization of stem cells from bone marrow to peripheral blood.

The authors reported:

> Although it is not known whether the mechanisms that govern
> release of stem and progenitor cells from the [bone marrow] into
> the blood are the same as those that direct homing of transplanted
> stem cells, there is evidence that cytotoxic agents such as
> [cyclophosphamide] disrupt normal marrow endothelial cell
> barriers and thus might both facilitate homing and release of
> hematopoietic cells.

(emphasis added; citation to Shirota, et al., omitted).

60.     In view of the foregoing state of the art, I believe that a POSITA would have been well aware that exact mechanisms explaining how chemotherapeutic agents enhanced stem cell mobilization from bone marrow to peripheral blood had yet to be fully characterized. Thus, the POSITA would understand the sentence at column 2, lines 34-36 stating that agents, "which open the endothelial barrier, rendering it permeable to stem cells," "may be used" in the practice of the invention to mean that the inventors wanted to encompass the use of agents that worked this way, should that prove to be the mechanism. But the POSITA would not interpret "chemotherapeutic agent" in claim 1 to be limited to agents that work by this mechanism. Rather, the POSITA would understand the term "chemotherapeutic agent" in claim 1 to encompass agents that damage or destroy cells, regardless of the exact mechanism by which they enhance stem cell mobilization.

61.     For all the foregoing reasons, I do not believe a POSITA would adopt Apotex's and Dr. Scadden's construction of "chemotherapeutic agent" in claim 1 of the '427 Patent. Rather, in my opinion, the POSITA would understand "chemotherapeutic agent" to mean an "exogenous substance capable of damaging or destroying microorganisms, parasites or tumor cells," in agreement with Amgen's proposed construction.

**B.**     ***"disease treating-effective amount"***

62.     The term "disease treating-effective amount" is used in claim 1 of the '427 Patent as follows:

> 1. A method of treating a disease requiring peripheral stem cell transplantation in a patient in need of such treatment, comprising administering to the patient a hematopoietic stem cell mobilizing-effective amount of G-CSF; and thereafter administering to the patient a <u>disease treating-effective amount</u> of at least one chemotherapeutic agent.  (emphasis added)

16

63. Contrary to what Apotex and Dr. Scadden suggest, I do not believe that a POSITA would find this term at all indefinite. Rather, in accordance with Amgen's proposed construction of "disease treating-effective amount," a POSITA would understand with reasonable certainty that the amount of chemotherapeutic agent administered is "an amount sufficient to enhance mobilization of stem cells for recovery from the blood for subsequent peripheral transplantation."

64. Apotex and Dr. Scadden rely on the following statement from col. 3, lines 24-30 of the '427 Patent as supporting their position that it would be unclear to a POSITA whether the chemotherapeutic agent being administered in claim 1 is for the purpose of stem cell mobilization, antitumor therapy or both. And further, because the purpose is allegedly unclear, the POSITA would be unable to determine an effective amount to administer. (*See*, Scadden Declaration ¶ 49):

> In addition, administration of G-CSF and a chemotherapeutic agent in the run-up to a , e.g., antitumor therapy offers the opportunity of recovering the stem cells mobilized in large amounts from the blood with higher efficiency (e.g., using leukopheresis), then performing the antitumor therapy using a cytostatic agent or irradiation and subsequently, conducting the peripheral stem cell transplantation.

65. In my opinion, it is clear from the foregoing passage of the specification, and several others cited below, that the chemotherapeutic agent referred to in claim 1 is being administered after G-CSF for the purpose of enhancing the mobilization of stem cells, and not for the purpose of antitumor therapy. That is what is meant in the quoted statement above by administering G-CSF and then administering a chemotherapeutic agent in the "run-up" to antitumor therapy. Administering the two agents in the specified order "offers the opportunity of recovering the stem cells mobilized in large amounts from the blood" by leukapheresis.

66.     A POSITA reading the '427 Patent would understand that in a protocol for treating a disease requiring peripheral stem cell transplantation, a step involving cytoreductive conditioning by myeloablative irradiation or myelotoxic chemotherapy (see ¶ 26–33, *supra*)—a step which the inventors of the '427 Patent referred to as "myeloablative or myelotoxic therapy" and "antitumor therapy"—would intervene between collection of mobilized stem cells and transplantation of the collected cells back into the patient.  But no POSITA would be confused that the step of "thereafter administering" a chemotherapeutic agent in claim 1 might be for the purpose of the intervening cytoreductive conditioning.  On the contrary, the specification of the '427 Patent teaches over and over again that the chemotherapeutic agent is being administered after G-CSF for the purpose of enhancing mobilization of stem cells so that they may be recovered more efficiently from blood and then stored for subsequent transplantation back into the patient <u>after</u> the patient has undergone cytoreductive conditioning, the regimen that a POSITA would understand was meant by "myeloablative or myelotoxic therapy" or "antitumor therapy" in the '427 Patent.

67.     The following are a sampling of passages from the '427 Patent specification that definitely convey that the step of "thereafter administering to the patient a disease treating-effective amount of at least one chemotherapeutic agent" in claim 1 is being done to enhance stem cell mobilization prior to recovery or collection by a procedure such as leukapheresis.  First in the abstract:

**Abstract**

The invention relates to the use of <u>G-CSF in combination with a chemotherapeutic agent</u> (in particular, cyclophosphamide) to produce a pharmaceutical preparation <u>for boosting the mobilization of hematopoietic stem cells from bone marrow</u> in the treatment of diseases requiring peripheral stem cell transplantation.  The

18

claimed combination results in <u>more efficient leukapheresis, e.g.,</u> <u>before myeloblative or myelotoxic therapy</u>.  (emphasis added);

And at col. 1, lines 5-17:

> The present invention relates to <u>the novel use of G-CSF and a</u> <u>chemotherapeutic agent</u> or a combination of chemotherapeutic agents to produce a pharmaceutical preparation <u>for enhanced</u> <u>mobilization of hematopoietic stem cells</u> in the treatment of diseases requiring peripheral stem cell transplantation as is the case, e.g., in high-dosage chemotherapy or bone marrow ablation by irradiation.  In addition, the invention is directed to a pharmaceutical packaging unit  containing G-CSF, chemotherapeutic agent(s) and informational <u>instructions regarding</u> <u>the application of the G-CSF and the chemotherapeutic agent or</u> <u>the combination of chemotherapeutic agents for enhanced</u> <u>mobilization of hematopoietic stem cells prior to the onset of a</u> <u>corresponding therapy</u>.  (emphasis added);

And at col 1, line 67 – col. 2, line 15:

> Surprisingly, it has now been found that an <u>unexpectedly</u> <u>high stem cell concentration in blood can be achieved when</u> <u>administering G-CSF in combination with a chemotherapeutic</u> <u>agent</u> (chemotherapeutic agents).
> Therefore, the invention is directed to the <u>use of G-CSF</u> <u>and a chemotherapeutic agent</u> or a combination of chemotherapeutic agents to produce a pharmaceutical preparation <u>for enhanced mobilization of hematopoietic stem cells</u> in the treatment of diseases requiring peripheral stem cell transplantation [ ]. . .   According to the invention, it is preferred to apply the <u>G-</u> <u>CSF prior to the onset of the administration of chemotherapeutic</u> <u>agents in order to enhance the mobilization of hematopoietic stem</u> <u>cells</u>.
> The combined use according to the invention of G-CSF and chemotherapeutic agent relates to <u>all those diseases requiring</u> <u>recovery of stem cells from the blood</u> for subsequent peripheral transplantation, particularly tumor diseases.  (emphasis added);

68.     Understanding the purpose for which the chemotherapeutic agent referred to in claim 1 was being given—enhancing stem cell mobilization—the POSITA would then understand that the "disease treating-effective amount" to be administered would be an amount that would serve this purpose.  As is clear from claim 1, the disease to be treated is one requiring

peripheral stem cell transplantation.  The treatment is the transplant.  The POSITA would understand to choose a dose of the chemotherapeutic agent that would enhance the mobilization of stem cells from bone marrow to blood so that they can be more efficiently collected, thereby creating a preparation of cells that results in a successful transplant when reinfused back into the patient after the myeloablative radiation or myelotoxic chemotherapy.

69.     The '427 Patent teaches a dosage range for the chemotherapeutic agent to be administered for stem cell mobilization purposes.  That range is from 0.05 – 100 mg/kg/day. *See*, '427 Patent, col. 3, lines 11-12.

70.     For a given chemotherapeutic agent, the "disease treating-effective amount," i.e., the amount sufficient to enhance the mobilization of stem cells for recovery from blood and subsequent transplantation, may well be an amount that would also serve the purpose of cytoreductive conditioning or cancer therapy.  But in the claimed method, it would be understood by a POSITA that the dose had to be sufficient to enhance mobilization of stem cells. The amount called for by the claim has nothing to do with the step of the protocol in which a myelotoxic chemotherapeutic agent is administered for cytoreductive conditioning, i.e., the step that would be performed after collection of the mobilized stem cells and prior to transplantation.

71.     In my opinion, a POSITA would be likely to start with a dose at which the chemotherapeutic agent is known to provide cancer therapy and test if, after administration of G-CSF, it was an amount sufficient to enhance stem cell mobilization.  It was certainly within the skill of a POSITA in December 1995, the priority date of the '427 Patent, to test for and select a dose of a given chemotherapeutic agent that would provide a "disease treating-effective amount" for the purpose of enhanced stem cell mobilization.

72.     In conclusion, I do not think a POSITA reading claim 1 of the '427 Patent in view of the specification would have any difficulty understanding why the chemotherapeutic agent was being administered (enhancement of stem cell mobilization) or be unable to determine a dose that would enhance stem cell mobilization so that successful peripheral stem cell transplantation could be achieved.  Consequently, it is my opinion that a POSITA would not consider "disease treating-effective amount" as used in claim 1 to be indefinite, but rather would understand the term with reasonable certainty, in accordance with the construction proposed by Amgen, *viz.*, "an amount sufficient to enhance the mobilization of stem cells for recovery from blood for subsequent peripheral transplantation."

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on January 8, 2016 in Boynton Beach, Florida.

Dated:  January 8, 2016

_____

LOUIS M. PELUS, PH.D.